**INDIANA BELL TELEPHONE COMPANY, INCORPORATED, Radiotelephone Company of Indiana, Inc. and Ram Broadcasting of Indiana, Inc., Appellants-Respondents,**

v.

**T. A. S. I., INC., Appellee-Petitioner,**

and

**Hancock Rural Telephone Corp., and Hendricks Telephone Corp., Appellees-Respondents.**

No. 2–1079A310.

Court of Appeals of Indiana, Fourth District.

April 19, 1982.

Rehearing Denied May 26, 1982.

John C. Carvey, Cartmel, Carvey, Latimer, Howard, Sellmer & McLin, Indianapolis, for appellant Radiotelephone Co. of Indiana, Inc.

Jerry Williams, John E. Taylor, Williams & Shoup, P. C., Indianapolis, for appellant Ram Broadcasting of Indiana, Inc.

Michael J. Huston, Fred E. Schlegel, Baker & Daniels, Indianapolis, for appellee T. A. S. I., Inc.

MILLER, Presiding Judge.

Respondents-appellants Radiotelephone Company of Indiana, Inc. (Radiotel) and RAM Broadcasting of Indiana, Inc. (RAM)[1] are appealing an order of the Public Service Commission of Indiana because the Commission allegedly acted arbitrarily and failed to make proper findings of fact in granting petitioner-appellee T. A. S. I., Inc. a "Certificate of Territorial Authority to Offer and Furnish Mobile Radio Telephone and Paging Service to the Public Within

1. Although Indiana Bell Telephone Co., Inc., entered an appearance as a respondent below, it has not pursued an appeal to this Court from the Commission's order.

Marion County, Indiana." [2] In essence, RAM and Radiotel challenge the sufficiency of the evidence and the adequacy of basic factual findings supporting the Commission's determination that 1) public convenience and necessity within the meaning of Ind.Code 8–1–2–88(b) require the proposed service by T. A. S. I.; 2) T. A. S. I. has adequate financial ability to render the proposed service; and 3) T. A. S. I. has adequate managerial and technical ability to render the proposed service. Based on our review of the record and the Commission's order, which included complete and specific factual findings based on substantial evidence, we affirm. We do not agree with T. A. S. I., however, that the appeal should have been dismissed for failure to timely file an assignment of errors, since this Court had previously granted RAM and Radiotel an extension of time to file the complete record on appeal.

The record reveals the instant cause was initiated by T. A. S. I. on December 8, 1978, when it filed with the Commission its petition for a certificate of territorial authority to furnish mobile radio telephone and paging service within Marion County, and further requesting approval of its rates, charges and rules, depreciation rates and authority to issue notes to finance new facilities. On March 12, 1979, T. A. S. I. prefiled exhibits and the direct testimony of Jerry Hellyer (president of T. A. S. I.), Robert Teipen (an accountant) and Arthur Peters (an engineer). Public hearings were held thereafter on several dates, on which occasions the Commission received the testimony of 16 additional witnesses for T. A. S. I., four witnesses for RAM, three witnesses for Radiotel, and one witness for Indiana Bell Telephone Co., Inc. (Bell).

The basic evidence received by the Commission may be summarized as follows: Originally, the Commission awarded a Certificate of Territorial Authority to Bell for Marion County, pursuant to Ind.Code 8–1–2–88(b), which provides in part:

"The commission shall have the power by order to require telephone companies to report, upon reasonable notice, in such manner as the commission shall prescribe by general rule, the territorial area or areas and the boundaries thereof within the state in which each such company now renders, is reasonably prepared to render, and proposes to render telephone service within a reasonable time. *The commission shall have the power to issue to each such company for any territorial area or areas so reported and not covered by a municipal franchise or any indeterminate permit, a certificate of territorial authority. The certificate shall determine and define the area or areas in which each such company shall thereafter render telephone service.* In cases of conflict involving two [2] or more telephone companies the commission, considering such reports separately, or by consolidation of two [2] or more or all, shall have the power to issue its certificate after notice of hearing and a hearing.

*After the issuance of such certificate no other telephone company shall render telephone service in the area or areas so determined and defined, except pursuant to a certificate granted by the commission, after notice of hearing and hearing, that public convenience and necessity require that telephone service in any such area be rendered or offered by another company. . . .*" (Emphasis added.)

Thereafter, limited certificates (for radio common carrier service) were awarded to RAM and Radiotel, both of which provide mobile telephone service, tone-only paging service and tone/voice paging service throughout Marion County.[3] Bell provides mobile telephone service and tone-only paging service.

---

2. Relevant portions of the Commission's detailed and lengthy order, which Radiotel concedes contains at least 58 findings of basic fact as well as additional findings of ultimate fact, are quoted in our discussion *infra* of the specific issues raised on appeal.

3. The Commission's order reflects, however, that RAM provides only "manual" mobile telephone service.

T.A.S.I. filed its petition seeking authority to provide mobile telephone service and both types of paging service in Marion County because "public convenience and necessity require that telephone service...be rendered or offered by another company." IC 8–1–2–88(b), *supra*. At the time T.A.S.I. filed its petition (and presently) it operated a telephone answering service (which is not regulated by the Commission) serving approximately 1200 customers. The thrust of T.A.S.I.'s evidence was that there is an unmet need in Marion County for the proposed service and that paging and mobile telephone service would also improve the service and convenience of T.A.S.I.'s existing answering service operation.

Thus, T.A.S.I. offered into evidence some 30 contracts and applications for paging and mobile telephone service and introduced the testimony of 16 witnesses who related their need for T.A.S.I.'s proposed service. Although some of these witnesses testified the service provided by other companies was good or adequate, others, such as Donald Fisher and Lowell Pinney, recounted various problems they had encountered with RAM and Radiotel, and many witnesses testified they had never been contacted by RAM or Radiotel regarding their service needs. In this regard, T.A.S.I.'s president, Hellyer, conceded RAM and Radiotel *could* meet the needs of Marion County with their existing facilities, but that they had failed to do so. Some of the witnesses called by T.A.S.I. indicated they could wait for the proposed services, while others, such as Ronald Felty, clearly identified a "present need" in their businesses.

Other evidence introduced by T.A.S.I. in support of its petition included testimony regarding a survey T.A.S.I. had conducted which revealed 41 persons had expressed an interest in obtaining 45 paging units (24 tone only and 21 voice and tone) and 42 individuals expressed an interest in obtaining 47 two-way mobile telephone units. As noted by the Commission's order, the hearings also disclosed four other organizations (including RAM and Radiotel) have filed applications with the Commission within a one-year period requesting new or additional facilities to meet needs for two-way radio telephone service in Marion County. RAM and Radiotel represented at the hearings they could meet all the paging and mobile telephone needs of that county.

There was some conflict in the evidence concerning the present financial condition of T.A.S.I. and its ability to undertake the proposed service, although it was undisputed the basic equipment costs would be about $39,000 for the paging operation and $58,000 for mobile telephone service. Hellyer testified T.A.S.I. had the financial ability to commence the proposed services, stating the purchase and installations funds would come from three sources: 1) a $20,000 cash contribution to T.A.S.I. by him; 2) a $117,000 loan to T.A.S.I. by First Bank and Trust Co., an indebtedness the company would assume according to its needs; and 3) the cash flow generated by the paging and mobile telephone services rendered by T.A.S.I., which Hellyer estimated would yield a net income of $6,266 in the first 12 months of operation. In addition, Teipen, T.A.S.I.'s independent accountant, testified T.A.S.I. had the financial ability to purchase and install the proposed equipment. His predictions for the first 12 months of operation were identical to Hellyer's; he also testified the company could be expected to receive $41,757 in net income for the second 12 months of operation.

RAM and Radiotel attempted to refute such evidence through cross-examination and the opinions of another accountant, one Bauman. Bauman testified T.A.S.I.'s current liabilities exceed its current assets by over $71,000 with respect to its answering service business (though he acknowledged this is not unusual among radio common carriers) and also asserted that if T.A.S.I. were to assume a $117,000 further indebtedness as proposed, the total amount of its issued securities would improperly exceed the value of the company's equipment and plant by over $140,000. Additionally, RAM and Radiotel also sought to establish numerous irregularities in the books of T.A.S.I. which were unknown to First Bank and Trust Co., when it agreed to loan $117,000

to the company. In this regard Hellyer admitted he had erred in stating by deposition that all of T.A.S.I.'s creditors had been paid, since it was discovered sometime later the company owed $25,000 to Bell. This amount was paid, however, before the Commission's order was issued. RAM and Radiotel also offered expert opinion evidence T.A.S.I. had used irregular accounting techniques and erred in its record-keeping in transactions with B & M Answering Service and Phyllis Jones, d/b/a Nite & Day Answering Service (the latter of which is suing T.A.S.I. for an alleged breach of contract), for charging T.A.S.I. with losses in the sale of dictaphone equipment by Hellyer, and in connection with the purchase by Hellyer of T.A.S.I. stock from the company's only other stockholder. RAM and Radiotel established that T.A.S.I.'s accountant had not performed an audit of the company's books.

Other evidence was elicited by RAM and Radiotel in efforts to challenge the management of T.A.S.I.'s answering service by Hellyer. Thus, after establishing Hellyer was the director, treasurer, chief operating officer, and sole current stockholder of T.A.S.I., RAM and Radiotel further revealed that Hellyer is uncertain about various aspects of the Company's business, such as the salaries paid to salesmen. With respect to the proposed expansion by T.A.S.I. into paging and mobile telephone service, it was disclosed there were not director resolutions authorizing T.A.S.I. to secure the *proposed* $117,000 loan and no shareholder authority for T.A.S.I. to grant a security interest to First Bank and Trust Co. in its accounts receivable and equipment as *proposed.* Hellyer conceded he had no formal training in paging and mobile telephone operation and no prior business experience in the same.

As noted above, the Commission entered detailed findings based on the above evidence and ultimately concluded, based on IC 8–1–2–88(b), that "public convenience and necessity" require that T.A.S.I. be issued a certificate authorizing it to provide paging and mobile telephone service in Marion County, and that T.A.S.I. had the financial and managerial ability to provide such service.

## DISCUSSION

Because the thrust of RAM's and Radiotel's contentions purport to challenge the factual findings made by the Commission, it behooves this Court to initially consider the distinction between "basic" and "ultimate" facts in an administrative proceeding and the function in appellate review of these two varieties of factual findings. The most recent expression by our Supreme Court in this regard is found in *Perez v. United States Steel Corp.*, (1981) Ind., 426 N.E.2d 29, 33, where the Court stated, in remanding for more complete findings a determination by the Industrial Board that one Perez had not suffered a permanent total disability within the meaning of relevant statutory provisions:

"[F]indings of basic fact must reveal the Board's analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim. The 'finding of ultimate fact' is the ultimate factual conclusion regarding the particular claim before the Board; here, for example, that ultimate question is whether Perez is permanently totally disabled. The finding of *ultimate* fact may be couched in the legal terms and definitions which govern the particular case. In contrast, the specific findings of basic fact must reveal the Board's determination of the various relevant sub-issues and factual disputes which, in their sum, are dispositive of the particular claim or ultimate factual question before the Board. The findings must be specific enough to provide the reader with an understanding of the Board's reasons, based on the evidence for its finding of *ultimate* fact." (Emphasis in original.)

A similar test has recently been enunciated by this Court in *Charles W. Cole & Son v. Indiana & Michigan Electric Co.*, (1981) Ind. App., 426 N.E.2d 1349, 1352–53, where the Court in ordering the Public Service Commission to make more detailed basic factual findings regarding the computations of the

amount of refund to be paid by an electric company to its retail ratepayers, stated:

"A distinction needs to be drawn between basic findings (or specific findings of basic facts) and ultimate findings (or ultimate conclusions), both of which are essential to judicial review of PSC orders. Basic findings are less detailed than a summary of the evidence, and they are not merely a recitation of testimony given or other evidence introduced. Basic findings are statements of those facts which the PSC determines, after considering the evidence introduced, to be true and relevant to factual determinations which must be made in order to properly decide the case. Ultimate findings are determinations or conclusions which flow rationally from the basic findings and are usually expressed in the language of a statutory standard. Ultimate findings are less detailed than basic findings. Moreover, unlike basic findings, ultimate findings are conclusions of law or mixed conclusions of law or policy and fact. *Perez v. United States Steel Corp.*, (Ind.) 426 N.E.2d 29 (1981); *Capital Improvement Board of Managers v. Public Service Commission*, (1978) Ind. App., 375 N.E.2d 616; 3 K. Davis, Administrative Law Treatise § 14.27, at 124 (2d ed. 1980)."

■ Thus, it is apparent an administrative agency must make sufficient basic factual findings to support the ultimate findings which the law requires. Stated differently, it must appear to an appellate court at its "first level" of review "that the Commission's decision contain[s] specific findings on all the factual determinations material to its ultimate conclusions," *L. S. Ayres & Co. v. Indianapolis Power & Light Co.*, (1976) 169 Ind.App. 652, 661, 351 N.E.2d 814, 822, at least where the fact issues are contested or disputed. *V.I.P. Limousine Service, Inc. v. Herider-Sinders, Inc.*, (1976) 171 Ind.App. 109, 111, 355 N.E.2d 441, 443, *citing Transport Motor Express, Inc. v. Smith*, (1972) Ind.App., 289 N.E.2d 737, *reversed on other grounds*, (1974) 262 Ind. 41, 311 N.E.2d 424. The degree of specificity required to enable this Court to intelligent-

ly review an agency's orders will necessarily vary from case to case, depending upon the quantity and complexity of the evidence introduced. *Charles W. Cole & Son v. Ind. & Mich. Electric Co., supra.*

■ In the instant case, the parties disagree as to which of the Commission's findings are "basic" and which are "ultimate." From a purely legal point of view, the distinction is significant, since basic findings need only be supported by substantial record evidence—the so-called "second level" of review—while ultimate findings must be supported by basic findings, which, of course, must themselves be supported by the record.

In essence, T.A.S.I. argues the Commission's sole "ultimate" findings are those required by IC 8–1–2–88(b), *supra*, namely, that "public convenience and necessity require that telephone service . . . be rendered or offered by another company. . . ." T.A.S.I. contends the Commission's other findings relating to its financial and managerial ability are "basic" findings which need only be appropriately supported by the record.

RAM and Radiotel, in response, persuasively cite authority for the proposition that Ind.Code 8–1–2–4, requiring every utility "to furnish reasonably adequate service and facilities" imposes additional determinations of ultimate fact on the Commission and must be read in *pari materia* with IC 8–1–2–88(b). *See General Telephone Co. of Indiana Inc. v. Public Service Commission*, (1958) 238 Ind. 646, 150 N.E.2d 891. In this regard they also cite the Commission's own precedent involving the denial of a previous application filed by Radiotel. *In re Radiotelephone Co. of Indiana, Inc.*, (Cause No. 29738, May 17, 1963) 49 P.U.R.3d 448. There, the Commission stated:

"This case is the first of its nature for the Public Service Commission of Indiana, wherein a radio communication service seeks a Certificate of Public Convenience and Necessity to render an interconnected radio dispatching system in conjunction with a land line telephone company.

If the Commission is to issue a second certificate, the Petitioner, among other things, must show:

1. That it has the corporate power, if a corporation to render the service petitioned for;

2. That it has the financial and managerial ability to render such service;

3. An adequate description of the area to be served;

4. That the telephone company serving the area is not willing and able to adequately serve the present and potential customers; and

5. That public convenience and necessity require such telephone service."

*Id.* at 452. In discussing the evidence in that case, the Commission noted that Respondent's (Bell's) facilities for offering mobile telephone service were not fully used and that it (Bell) was willing and able to adequately serve all of its customers and additional customers at that time. *Id.*

Although T.A.S.I. contends the Commission has not cited its own precedent in more recent cases, including the grant of subsequent applications by RAM and Radiotel, we ultimately find it unnecessary to determine whether the Commission's various findings in this case should properly be viewed as required "ultimate" findings, since each of the findings challenged by RAM and Radiotel is supported by substantial evidence *and* by additional material findings of "basic" fact. In other words, we find no error in the Commission's detailed factual findings and conclude the various arguments propounded by RAM and Radiotel are essentially only efforts to persuade this Court to re-weigh the evidence. These contentions are discussed in detail as follows:

## I.

### Convenience and Necessity

With respect to the essential criteria of IC 8–1–2–88(b) that "public convenience and necessity require" the service proposed by T.A.S.I., RAM and Radiotel assert that based on the evidence, the Commission's

conclusion was arbitrary, capricious and contrary to law and that it rested solely on incompetent evidence. They contend: 1) the testimony submitted by T.A.S.I. showed only the "speculative future" needs and preferences of an isolated few; 2) the Commission improperly relied on evidence of the failure of RAM and Radiotel to market their services; 3) RAM and Radiotel are in fact able to meet the needs of Marion County; 4) applications submitted by other companies should not have been relied on by the Commission as proof of need; and 5) evidence regarding T.A.S.I.'s investigation of public need was improperly relied upon as hearsay evidence.

Several cases decided by this Court—one of them cited and discussed in the Commission's own order—provide a useful point of departure in addressing the first two contentions of RAM and Radiotel. In *VIP Limousine Service, Inc. v. Herider-Sinders, Inc., supra,* this Court considered the legal meaning of "public convenience and necessity" with respect to an application to render intrastate common carrier service (pursuant to Ind.Code 8–2–7–15, which employs this same phrase found in IC 8–1–2–88(b)), and further considered the argument that a minimum standard of proof must be met by an applicant in every common carrier proceeding. In addressing this latter contention, the Court in *V.I.P. Limousine* stated:

"In the 'distinct need' contract carrier situation, the supporting shippers are a clearly defined evidentiary source, whose needs are to be served by the applicant. The identified individual shippers can readily testify as to the specifics of their respective 'distinct needs.' The common carrier applicant may not so readily amass and present supportive evidence, since that evidence must relate to a multifaceted, if not illusory, conglomerate—the public at large. Because the public's needs and demands are gauged by many variables, specific evidentiary factors necessary to establish 'public convenience and necessity' may not, therefore, be categorized or fixed.

It ill behooves a court of review to establish for all cases, a qualitative and quantitative evidentiary standard for proof of public convenience and necessity. We hold, therefore, that the formulation of 'minimum standards of proof' or evidentiary criteria which will aid the Commission in determining the presence or absence of the ultimate facts in a given common carrier case must be left in large measure to the informed discretion of the Commission."

*Id.* 171 Ind.App. at 114–15, 355 N.E.2d at 445. It was further noted in that case, however, that "[m]ere public convenience, standing alone, is not [a] sufficient basis for issuance of a common carrier certificate," *id.* at 116, 355 N.E.2d at 445, and that "[p]ublic convenience and necessity, present and future, is the controlling factor." *Id.* at 117, 355 N.E.2d at 446. The Court in *V.I.P. Limousine* ultimately remanded that action "because the order of the Commission is the result of an unexplained application of unfound basic facts to unstated legal principles which may or may not be controlling." *Id.* at 118, 355 N.E.2d at 447.

In *Jack Gray Transport, Inc. v. Public Service Commission,* (1978) Ind.App., 380 N.E.2d 1250, this Court reiterated the principles of *V.I.P. Limousine Service, Inc. v. Herider-Sinders, Inc., supra,* in holding an applicant for a common carrier certificate had met his burden of proof with respect to "between point" service. There, the applicant submitted evidence from six shippers located in various Indiana cities revealing their experience with other carriers had been unsatisfactory. Although the Commission denied the request for a statewide certificate, it permitted a more limited service between the shippers' cities and between those cities and other points in Indiana. In affirming, this Court observed, *inter alia:*

"The shippers showed need for more common carriers of scrap metal by giving volume figures for scrap metal movements and by showing that the present common carrier service, which they termed inadequate, led to loss of business and revenues. Other evidence of service

inadequacies by the present carriers included use of the wrong type of equipment, the emphasis of the carriers' transportation of coal over scrap metal, failure of one or more of the carriers to solicit the shippers' business, and the excessive distance from carrier to shipper. Such evidence adequately shows the need for additional common carriers, and reasonably gives rise to the inference that the present carriers will not be harmed by the proposed operation."

*Id.* at 1255.

 With these cases in mind, we believe sufficient evidence supports the Commission's determination of public need and necessity in the instant case. This evidence included: 1) the testimony of 16 public witnesses; 2) T.A.S.I.'s investigation and survey results, showing 41 persons indicating a need for paging service and 42 persons expressing a need for mobile telephone service; 3) 30 contracts with T.A.S.I. for the proposed service; and 4) the evidence that RAM and Radiotel, as well as others, were themselves seeking additional certificates. While it is true that in the instant case, as opposed to *Jack Gray Transport,* there was not an abundance of evidence of "erratic" or inadequate service by the existing companies, the record reveals many of the witnesses called by T.A.S.I. testified RAM and Radiotel had failed to solicit their business, a factor noted by the Court in *Jack Gray Transport.* In addition, other witnesses testified as to their preference for service by T.A.S.I., evidence which appears relevant under the rule expressed in *Decatur County R.E.M.C. v. Public Service Commission of Indiana,* (1970) 146 Ind.App. 699, 710, 258 N.E.2d 180, 187, that "[e]vidence of customer preference is relevant in hearings concerning public convenience and necessity, and is therefore a factor to be considered by the Commission in making its determination." Moreover, the fact that many of the witnesses testified they would be willing to wait for T.A.S.I. to provide service does not make the Commission's order arbitrary or contrary to law, since, as acknowledged by the Court in *V.I.P. Limousine Service v.*

*Herider-Sinders, Inc., supra* 171 Ind.App. at 116–17, 355 N.E.2d at 446, "convenience and necessity ... implies something less than absolute or acute need."

 Nor do we agree with Radiotel that the Commission's order was improper because it did not contain a finding that RAM, Radiotel and Bell were not willing and able to provide the proposed service. Radiotel's contention is based on the language appearing in *Kosciusko County Rural Electric Membership Corp. v. Public Service Commission*, (1948) 225 Ind. 666, 672, 77 N.E.2d 572, 575. However, as noted by this Court in *Decatur County R.E.M.C. v. Public Service Comm., supra* 146 Ind.App. at 712, 258 N.E.2d at 188, *Kosciusko* referred to the absence of evidence or findings that appellant R.E.M.C. was not ready, willing and able to *adequately* serve all customers. Where, as here, the Commission does find a utility has failed to market its services,[4] it may deduce from such finding that the company is neither willing nor able to *adequately* meet the public's needs. As stated in *Decatur County R.E.M.C. v. Public Service Comm., supra* at 712, 258 N.E.2d at 188:

> "To focus on ability or lack thereof, is not extremely helpful because in most cases any involved utility is *able* to serve in the sense that it has the physical power or capacity to perform. Thus, it would be possible for a utility to be ready, willing and able to serve and yet not be ready, willing and able to *adequately* serve. We, therefore, hold that readiness, willingness and ability are only three of many factors involved in determining adequacy of service...."

Finally, RAM and Radiotel have not presented cogent argument that evidence of T.A.S.I.'s own investigation was hearsay, nor have they cogently demonstrated how it was arbitrary or contrary to law for the Commission to consider in its determination the fact that RAM, Radiotel and others have requested certification similar to T.A.S.I.'s based on the perceived need and convenience of the public. In this regard, T.A.S.I. correctly notes that RAM mischaracterizes the Commission's order in suggesting the Commission regarded such applications as "proof" of public need.

## II

### *T.A.S.I.'s Financial Ability To Render Proposed Service*

RAM and Radiotel contend IC 8–1–2–4, *supra* requires the Commission to find as an "ultimate" fact that T.A.S.I. had the financial ability to render the proposed service. Although they do not challenge the fact the Commission did so find, they contend: 1) the Commission erred in failing to make "basic" factual findings with respect to its "conflicting" financial representations; and 2) the Commission's ultimate finding was arbitrary and unreasonable because the evidence showed T.A.S.I. did not have the present ability to render the proposed service and evidence of its future ability was speculative.

Although RAM and Radiotel do not suggest precisely what manner of "basic" factual findings should have been made by the Commission, we believe the findings which were made were sufficient to make the Commission's decision an informed one and to permit review by this Court.

Preliminarily, we note the Commission's findings included recognition of the proposed cost of equipment and installation, T.A.S.I.'s proposed rates, and the fact that First Bank & Trust Co. had extended a commitment letter to loan T.A.S.I. $117,000 for the proposed project, an amount in excess of the equipment and installation expenses. The findings similarly noted the net income projections for the new service, which the Commission appropriately viewed as "estimates" from which "the actual results could vary." The Commission found, however, that "[b]ased on the assumptions

---

4. In this regard, we find no merit in the suggestion that RAM and Radiotel were precluded from soliciting the business of customers by virtue of a Commission rule requiring public utilities to minimize advertising expenses and prohibiting them from passing on to ratepayers the cost of unnecessary advertising. *See* 170 IAC 1–3–3 (1979).

and projections set forth in that Exhibit [T.A.S.I.'s Exhibit 18] and in Mr. Teipen's direct testimony, Petitioner's RCC Division would have a net income for the first 12 months of $6,266 and for the second 12 months of $41,757." Additionally, the Commission also found as follows:

"14. With respect to Petitioner's financial condition the Respondents asserted and attempted to establish primarily through cross-examination of Petitioner's witnesses that the financial statements presented by Petitioner in this proceeding show that Petitioner is not in a sound financial condition and that there are additional liabilities of Petitioner which were not shown on those financial statements. Much of the Respondent's attack went to Petitioner's answering service operations. The Commission points out that it has no jurisdiction of the answering service and will be regulating only the Petitioner's mobile telephone and paging service. The Commission has studied the financial statements presented by Petitioner herein as well as the testimony respecting those statements, including that concerning the relationships between current assets and current liabilities and between the value of plant and the amount of outstanding securities, and finds that such evidence does not require, and would not support, a finding that Petitioner does not have the financial ability to provide the proposed service for which authority is sought herein. The commitment of First Bank and Trust Company to lend the Petitioner $117,000 on favorable terms is evidence of the financial stability of Petitioner to render the proposal service...."

As noted in *Charles W. Cole & Son v. Ind. & Mich. Electric Co., supra,* the degree of specificity required in agency findings to enable intelligent review by this Court will necessarily vary from case to case, depending upon the quantity and complexity of the evidence introduced. Here, where RAM and Radiotel's principal attack with respect to T.A.S.I.'s financial ability involved cross-examination of witnesses[5] regarding the company's present answering service business, we believe the Commission's findings were adequate—particularly since, as Teipen testified, separate books and records would be kept for the proposed new service, which the evidence also revealed would be largely funded by an independent bank loan. In this regard, the Commission's findings also noted "Mr. Hellyer testified that all amounts borrowed from First Bank and Trust Company against the $117,000 loan will be used only for the purpose of acquiring property and material, including installation costs, used by Petitioner to provide paging and mobile telephone service," and the evidence included a copy of the Bank's commitment letter outlining the terms of the loan.

■ Based on the record which was made, we also do not believe the agency's decision was arbitrary or contrary to law. Clearly, the evidence with respect to T.A.S. I.'s future financial ability was not, as RAM and Radiotel contend, "speculative," since the evidence included a bank commitment letter to loan $117,000. Although no loans had yet been made to the company, there was no need (as T.A.S.I. observes on appeal) for Hellyer to contribute $20,000 to T.A.S.I. or for T.A.S.I. to borrow $117,000 from First Bank & Trust Company "until T.A.S.I. obtained the authority to provide the service for which the money was needed." Additionally, although the record reveals T.A.S.I.'s current liabilities exceed its current assets, RAM and Radiotel's own ac-

**5.** In this regard, T.A.S.I. persuasively contends its financial representations were not, in fact, "conflicting," since the initial financial statements it submitted "reflected the financial condition of T.A.S.I. on the date indicated on such statements based on the facts and information available at the time to persons preparing such statements," and that the length of the agency proceeding and intervening circumstances re-

quired it to revise its statements. For example, Hellyer conceded, as noted above, the initial statements did not disclose a $25,000 indebtedness which was later discovered and arrangements made for payment. We note our Courts have suggested basic factual findings are generally required only with respect to disputed or contested material fact questions. *V.I.P. Limousine Service v. Herider-Sinders, Inc., supra.*

countant, Bauman, conceded this was not unusual for radio common carriers,[6] and, as noted by the Commission's findings, the willingness of the bank to loan T.A.S.I. $117,000 was evidence of its secure financial condition. Bauman also offered his opinion T.A.S.I.'s securities offerings would improperly exceed the value of its property if the company borrowed $117,000. However, the Commission found, as noted above, that all of such money borrowed would be used to purchase and install equipment and therefore "the amount borrowed by Petitioner from First Bank and Trust Company will not exceed the fair value of Petitioner's property used and useful in rendering the service authorized. . . ." This finding by the Commission was supported by substantial evidence.

### III.

#### Managerial Ability To Render The Proposed Service

RAM and Radiotel also contend the Commission failed to make adequate findings on T.A.S.I.'s managerial ability to render paging and mobile telephone service. Like its argument on T.A.S.I.'s financial condition, this contention is based on the proposition that the Commission's determination the "petitioner has the managerial ability to provide the proposed service" is an "ultimate" finding which must be supported by "basic" findings to permit judicial review.

■ Again, we find the Commission's "basic" fact findings were sufficient to permit our review, given the relatively simple and non-technical issue at hand, namely, the managerial assets of T.A.S.I. *See V.I.P.*

*Limousine Service, Inc. v. Herider-Sinders, Inc., supra.*

In this regard, the findings pertaining to T.A.S.I.'s current financial ability, including those pertaining to the bank's willingness to loan $117,000 are clearly relevant to a determination that T.A.S.I. has significant managerial ability. The Commission further found that T.A.S.I.'s answering service handles the work of some 1,200 customers, that the company "has also received a number of requests from its telephone answering service customers for paging and mobile telephone service," and that "Petitioner has made adequate arrangements to acquire, install, maintain and repair equipment capable of providing the proposed paging and mobile telephone service." We believe these findings, though not conveniently grouped in any one paragraph of the Commission's order, give this Court sufficient insight into the agency's decision-making process to permit meaningful review of its findings on managerial ability and each is clearly supported by substantial record evidence.

### MOTION TO DISMISS APPEAL

Although we thus conclude the Commission's decision in this case should be affirmed, we cannot agree with T.A.S.I. that the appeal should have been dismissed because no assignment of errors was filed within 30 days after the Commission's order pursuant to Ind.Code 8–1–3–1.[7] T.A.S.I.'s argument in this regard is premised on the fact that although RAM and Radiotel requested various extensions of time in which to file "the record of proceedings before the Public Service Commission," they did not ask for such an extension to file their assignment of errors, nor does the statutory

---

6. Evidence before the Commission revealed Radiotel's and RAM's current liabilities also exceeded current assets.

7. That statute provides, in part:
 "Any person, firm, association, corporation, city, town or public utility adversely affected by any final decision, ruling, or order of the public service commission of Indiana, may, within thirty [30] days from the date of entry of such decision, ruling, or order, ap-

peal to the Appellate Court [Court of Appeals] of Indiana for errors of law. . . . An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence, to sustain the findings of fact upon which it was rendered."

definition of the "record" before the Commission include an assignment of errors.[8]

 We believe, however, that this Court's orders granting extensions to file "the record" must be read in consonance with Ind. Rules of Procedure, Appellate Rule 7.2(A) (which was not cited or discussed by T.A.S.I.), which provided in part at that time.[9]

"(A) Definition. The record of the proceedings shall consist of the following documents:

(1) A certified copy of the motion to correct errors or an assignment of errors. . . ."

From our reading of this Rule, we believe it is apparent this Court, in granting an extension to file the record, was at the same time implicitly granting an extension of time to file with this Court RAM's and Radiotel's assignment of errors—a document which, unlike a motion to correct errors, is not filed in the tribunal below. *Kentucky-Indiana Municipal Power Ass'n v. Public Service Co. of Indiana, Inc.,* (1979) Ind.App., 393 N.E.2d 776. Significantly, A.R. 7.2(A) states the record shall include a "copy" of any motion to correct errors, but does not use similar language when referring to an assignment of errors.

 Although T.A.S.I. cites *Kentucky-Indiana Municipal Power Ass'n v. Public Service Co. of Indiana, Inc., supra* at 783, for the proposition that the inclusion of an assignment of errors in the record is not essential to this Court's jurisdiction but merely "a matter of convenience to this Court," we note the Court in *Kentucky-Indiana Municipal Power Ass'n* also made the following remarks pertinent to the instant appeal:

"In *Scott Paper Company* [ (1975), 164 Ind.App. 565, 330 N.E.2d 137] an appeal from an order of the Public Service Commission was dismissed for lack of jurisdiction where the appellant failed to file an assignment of errors as required by IC 1971, 8–1–3–1 (Burns Code Ed.) and the Rules of Appellate Procedure. In ordering dismissal the court appears to have relied upon the decisions in *Moore v. Spann,* [ (1973) 157 Ind.App. 33, 298 N.E.2d 490, *rehearing denied,* 302 N.E.2d 825] where appellants failed to include in the transcript a certified copy of the motion to correct errors, and *Means v. Seif Material Handling Co.,* (1973), 157 Ind. App. 492, 300 N.E.2d 895, where no assignment of errors was filed in an attempted appeal from the Indiana Industrial Board.

In dictum the *Scott Paper Company* majority observed that the jurisdictional requirement also required the inclusion of the assignment of errors in the transcript, expressly relying upon *Moore v. State, supra.*

That statement was in error and *Scott Paper Company* should be restricted to those cases *where no assignment of errors is timely filed.*" (Emphasis added.)

We believe it is apparent from the language of this case and from A.R. 7.2(A)(1) that an appeal will not be dismissed for lack of jurisdiction in this Court unless no assignment of errors is timely filed *either* separately or with the record of proceedings, as specified by A.R. 7.2(A)(1). Ind.Code 8–1–3–4, also cited by T.A.S.I., does not require a different result. That statute merely provides in relevant part:

"No extension of time shall be granted by the Appellate Court for the filing of an assignment of errors and the transcript of the record, unless a showing be made that the written request for the record was duly filed within the time here granted."

We affirm the Commission's order.

CONOVER and YOUNG, JJ., concur.

---

8. T.A.S.I. cites Ind.Code 8–1–3–4, which states, in part, that the "record" before the Commission included:

"... all pleadings and papers filed, notices given and entered of record, proceedings had, testimony taken, and orders entered therein."

9. The rule has since been amended to state, in part: "*(A) Definition.* The record of proceedings shall consist of the following documents: (1) A copy of the motion to correct error or an assignment of error. . . ."