**RAM BROADCASTING OF INDIANA, INC., and Radiotelephone Company of Indiana, Inc., Respondents-Appellants**

v.

**MCI AIRSIGNAL OF INDIANA, INC., Petitioner-Appellee,**

and

Indiana Bell Telephone Company, Incorporated, United Telephone Company of Indiana, Incorporated, General Telephone Company of Indiana, Incorporated, Home Telephone Company, Inc., Monrovia Telephone Corporation, Home Telephone Company of Pittsboro, Inc., Communications, Corporation of Indiana, Inc., T.A.S.I., Inc., Hancock Rural Telephone Corp., Hendricks Telephone Corp., Clay County Rural Telephone Corporation, Smithville Telephone Company, Tri-County Telephone Company, Digital Paging Systems of Indiana, Inc., and Multi-Page, Inc., Respondents-Appellees.

No. 2–983A351.

Court of Appeals of Indiana, Third District.

Aug. 28, 1985.

Jerry Williams, John E. Taylor, Williams & Shoup, Indianapolis, for respondents-appellants.

William B. Powers, Charles J. Somes, Indianapolis, for respondents-appellees.

## MEMORANDUM DECISION

GARRARD, Judge.

This is an appeal from a Public Service Commission of Indiana (Commission) decision allowing MCI Airsignal of Indiana (MCI) to enter the telephone paging market

in an eight county area surrounding Indianapolis.[1]

Lay people would identify the paging services at issue here as the small rectangular box which beeps when the carrier has a telephone call. The parties explained that in addition to the "beepers," there are also paging devices through which a voice message may be transmitted and devices which have a screen upon which transmitted numbers can be displayed. Apparently, alphabetical display paging is in development and will also be available soon.

The paging devices are usually activated by radio wave signals over radio frequencies assigned by the Federal Communications Commission (FCC). Most companies which offer these services are radio common carriers (RCC's) such as RAM Broadcasting, Radiotelephone Company of Indiana, and Digital Paging Systems of Indiana.[2] When MCI's petition was granted, it became the fifth RCC for the eight county area.

The Commission regulates the number of paging market participants. Pursuant to IC 8-1-2-88(a)(1), telephone service is defined as the transmission of intelligence between two or more points through the use of electricity. Telephone service is provided by telephone companies under IC 8-1-2-88(a)(2) and IC 8-1-2-1 defines telephone companies as public utilities which are, of course, subject to certification by the Commission.

The Commission found that MCI met the four criteria necessary for a grant of territorial authority: corporate power, financial and managerial service, service area description and public convenience and necessity. At the Commission hearing, as now, RAM Broadcasting and the other respondents-appellants opposed MCI's entrance into the radio wave paging market in the area surrounding Indianapolis.[3]

1. The affected counties are Johnson, Hancock, Boone, Shelby, Marion, Hamilton, Hendricks and Morgan.

2. The other type of servicer is landline telephone companies, such as Indiana Bell, which have an RCC division in order to convert the

## ISSUES

RAM raises nine issues on appeal:

1. Was the Commission's adoption and application of the theory of regulated competition instead of regulated monopoly contrary to law?

2. Did the Commission err in failing to articulate the meaning it ascribed to "public convenience and necessity?"

3. Did the Commission err where it relied upon policies and rulings of the Federal Communications Commission?

4. Was the Commission's order improper because it did not contain a finding that the radio common carriers serving the area were not willing and able to adequately serve the present and potential customers?

5. Did the Commission improperly perform a rule making function in an adjudicatory proceeding?

6. Did the Commission err when it admitted over objection the study by Walker Research, Inc.?

7. Did the Commission grant MCI excessive relief?

8. Did the Commission show bias in finding that MCI possessed the requisite financial and managerial ability?

9. Did the Commission err by not stating in its order that petitioner-appellee had to file the same tariff as submitted at the hearing?

### Issue One

RAM argues that the Commission has impermissibly changed policy directions by abandoning a course of regulated monopoly for one of regulated competition. Some background is necessary to illuminate the issue before us.

telephone call into a radio wave which will activate the device.

3. For simplicity, the appellants will collectively be referred to as "RAM" throughout this opinion.

Public Service Commission certification of telephone companies is governed by IC 8-1-2-88(b). It reads in part:

"After the issuance of [a] certificate no other telephone company shall render telephone service in the area or areas ... except pursuant to a certificate granted by the commission, after notice of hearing and hearing, that *public convenience and necessity require that telephone service ... be rendered or offered by another company.*" (emphasis added)

■ Accordingly, the Commission is given discretion to define "public convenience and necessity" through the wording of this statute. In addition, we have repeatedly held that the public convenience and necessity determination is best left to the informed discretion of the Commission as it is necessarily fact, and circumstance, specific. *See, e.g., V.I.P. Limousine Service, Inc. v. Herider-Sinders, Inc.* (1976), 171 Ind.App. 109, 355 N.E.2d 441. This flexible approach seems appropriate given the ever-changing technology in the communications field as evidenced by the paging devices themselves in the instant case.

When deciding how to gauge public convenience and necessity in the paging market, the Commission took its lead from the FCC. In *In the Matter of the Amended Petition of Radiotelephone Co., et al.* P.S.C. Cause No. 35983 (October 1, 1981), the Commission expressly adopted a policy toward regulated competition in the RCC industry similar to that of the FCC's. The Commission stated that while new RCC's would not be authorized merely to foster competition, competition was a relevant factor of "public convenience and necessity" since it would force RCC's into providing up-to-date technology and better service to subscribers. *Id.* at 11. They further emphasized that public convenience and necessity is the primary consideration, thus avoiding the FCC pitfalls highlighted in *Hawaiian Telephone Co. v. FCC* (D.C.

Cir.1974), 498 F.2d 771 which held that the FCC could not use promotion of competition as a key factor apart from public convenience and necessity. "The initial question for the [F.C.C.] ... must be whether public interest requires more or different service." *Id.* at 346.[4]

■ In applying the new policy standards to MCI the Commission once again explained that it deems competition to be "an element of the ultimate finding of public convenience and necessity for radio common carriers...." *In the Matter of MCI Airsignal of Indiana, Inc.,* P.S.C. Cause No. 37113 (September 9, 1983). There is no indication that the standard has been inconsistently or unevenly applied here. We can find no reason to interfere with the Commission's determination that competition is an element of public convenience and necessity in the area of radio wave paging and its adherence to that standard in the instant case.

*Issue Two*

RAM presents another issue in a related argument. RAM claims that the Commission neglected to properly articulate its definition of public convenience and necessity. The foundation of RAM's contention is in the administrative law axiom that administrative decisions must be premised upon ascertainable standards. *Natural Resources Commission v. Sullivan* (1981), Ind.App., 428 N.E.2d 92, 101; *Clarkson v. Department of Insurance* (1981), Ind.App., 425 N.E.2d 203, 207, *transfer denied.* As noted above, the Court of Appeals has refused to establish for all cases a qualitative and quantitative evidentiary standard for proof of public convenience and necessity. *V.I.P., supra,* 171 Ind.App. at 115, 355 N.E.2d at 445.

■ In this context, then, the ascertainable standards test does not connote an inflexible checklist which the Commission applies to all RCC's seeking certification.

---

**4.** Indeed RAM has attempted to make *Hawaiian Telephone*-type arguments about the Commission in the past with a lack of success. *RAM Broadcasting of Indiana v. Digital Paging Sys-* tems (1984), Ind.App., 463 N.E.2d 1104, 1113–14; *RAM Broadcasting of Indiana v. Digital Paging Systems* (1984), Ind.App., 464 N.E.2d 336.

*See RAM Broadcasting v. Digital Paging Systems* (1984), Ind.App., 463 N.E.2d 1104, 1112–13 (hereinafter *Digital I*); *RAM Broadcasting of Indiana v. Digital Paging Systems* (1984), Ind.App., 464 N.E.2d 336, 345 (hereinafter *Digital II*). Our approach is guided by *V.I.P. Limousine, supra* whereby we scrutinize Commission findings of public convenience and necessity for a rational relationship between facts found and conclusions reached and for an appropriate exercise of discretion. *Id.*, 355 N.E.2d at 445; *Digital I* at 1113.

The Commission noted at the outset of its findings that the respondents hotly disputed the existence of public need and convenience. It stated:

"The Petitioner presented a variety of evidence on the issue of public convenience and necessity. The bulk of the Petitioner's evidence consisted of Petitioner's Exhibit 20, a survey conducted by Walker Research, Inc., in May of 1983, of the Indianapolis area radio paging market. The survey was prepared under the supervision of Donald J. Hargadon, a telecommunication industry consultant with Walker Research. The survey was conducted by taking a random sample of business telephone numbers in the Indianapolis metropolitan area. The business would then be called and asked a series of questions from a prepared questionnaire. Based on the survey, Hargadon testified that the number of radio paging units that could be leased, rented or sold in the Indianapolis metropolitan area lies between 1,225 and 2,635 at the time of study. As further support of its contention that public convenience and necessity requires the issuance of a certificate of territorial authority to MCI Airsignal of Indiana, the Petitioner brought in three public witnesses who testified that they had present unmet needs for radio paging service in the Indianapolis metropolitan area.

\*　　\*　　\*　　\*　　\*　　\*

The essential dispute between the parties on this point did not concern whether or not there would be growth, but which

company would benefit from this growth.... The Respondents argued that MCI would be merely duplicating business already being offered by existing companies, and these companies are fully capable of absorbing whatever growth there might be in the radio paging market in the next few years. The Respondents' contentions are best reflected in their proposed order where it characterized the entrance of MCI Airsignal into the Marion County metropolitan area radio paging market as a 'financial disaster' for one or more of the existing radio paging services.

The concerns voiced by the Respondents concerning possible future economic duress through competition are essentially the same problems faced by any business in a free market system. As this Commission has noted earlier, the approach to the radio common carrier industry must emphasize regulated competition, and not monopolization. For this Commission to accept the arguments of the Respondents on this point and deny the Petitioner a Certificate of Territorial Authority would be contrary to a policy of regulated competition, and would turn this Commission into a barrier against free trade. This Commission will exercise its responsibilities under the law, however, regulation of business by an administrative body can only achieve a limited number of objectives. Free and vigorous competition in the marketplace is the best regulator of industries lacking natural monopoly characteristics. Accordingly, based on the evidence, the Commission finds that public convenience and necessity require the issuance of a Certificate of Territorial Authority for radio paging service to the Petitioner."

■ Given that the Commission has found that the goal of public convenience and necessity is furthered by competition and that evidence was presented that the demand for paging devices was growing and often unmet, we cannot find that the Commission abused its discretion or failed

to detail its reasons for granting the certificate.

*Issue Three*

 As discussed in the first issue, the Commission adopted the FCC pro-competition stance with respect to radio common carriers. RAM contends this was error. We do not agree.

When adopting this policy, the Commission stated, "While the FCC's policy is not binding upon us, we believe that policy is sound, in the best interests of the public and should be implemented by this Commission to the extent permissible under Indiana law." The Commission did not sidestep its duties, rather it made use of the FCC's research and conclusions. As Justice Doolin of the Oklahoma Supreme Court in *Data Transmission Co. v. Corporation Commission* (Okla.1976), 561 P.2d 50 commented, "[I]t would be injudicious to ignore the conclusions of the FCC, gained after extensive research and study." 561 P.2d at 55. Clearly, the Commission independently analyzed the FCC's conclusions before voluntarily adopting a pro-competition stance. No error was committed. *Cf. Digital I* at 1113; *Digital II* at 346 (Commission did not abrogate its statutory duty to FCC when it merely noted that the ultimate location of frequencies was within the FCC's exclusive jurisdiction).

*Issue Four*

 The fourth issue RAM raises maintains that the Commission's order was improper because it did not contain a finding that other radio common carriers were not willing and able to adequately serve customers. The Commission was not required to make this finding and thus did not err.

In the case of RCC's, the Commission formerly required that five elements be met prior to certification. The elements were: corporate power of the petitioner, financial and managerial ability, an adequate description of the area to be served, public convenience and necessity, and inadequacy of present service. The first four tests have been employed consistently. The fifth, inadequacy of present service,

has been discarded as it has ceased being useful and compatible with new trends in regulatory thought. *See In the Matter of the Petition of Multi-Page, Inc.* (July 29, 1983) Cause No. 37058 at p. 2. The roots of this change are in *Decatur County R.E. M.C. v. Public Service Co. of Indiana* (1970), 146 Ind.App. 699, 258 N.E.2d 180. Judge Sullivan stated that:

"To focus on ability or lack thereof, is not extremely helpful because in most cases any involved utility is *able* to serve in the sense that it has the physical power or capacity to perform.... The question here is whether [another] is ready, willing and able to *adequately* serve the territory...."

146 Ind.App. at 712, 258 N.E.2d 180. Judge Miller interpreted this language with respect to RCC's in *Indiana Bell Telephone Co. v. T.A.S.I., Inc.* (1982), Ind.App., 433 N.E.2d 1195. Although the Commission's order in *T.A.S.I.* did not contain a finding that other RCC's were not willing and able to provide service, *T.A.S.I.* held that the failure of existing RCC's to adequately service could be deduced from the RCC's poor marketing of paging services. *Id.* at 1203.

As a result, the element of present services' inadequacy to meet present and future needs has become virtually meaningless. The Commission no longer makes findings on this element in new RCC petitions.

We see no gain in continuing the pretense that this fifth element of readiness and willingness has survived the Commission's analytical evolution with respect to RCC's. It is committed to the Commission's discretion to fashion the proper approach to certifications. We will not establish elements of proof which RCC's must meet in order to be certified. *Digital I, supra* at 1112; *V.I.P., supra*, 355 N.E.2d at 445.

*Issue Five*

 RAM contends that the Commission improperly engaged in rule making in an adjudicatory proceeding when it labeled the

respondent RCC's as lacking "natural monopoly characteristics."

In the orders appealed in *Digital I, supra* and *Digital II, supra,* the Commission had remarked upon the fundamental differences between RCC's and landline telephone companies, the former having finite servicing potential and the latter possessing infinite potential for service. The Court in *Digital I* and *Digital II* noted that the Commission was merely stating the obvious in its remarks. *Digital I, supra* at 1115 and *Digital II* at 347. The Commission is doing no more than this here in commenting that the RCC's lack natural monopoly characteristics.

Indeed "lacking natural monopoly characteristics" appears to be a shorthand way of referring to the distinction between the finite abilities of RCC's and the infinite ones of landline companies. The Commission's labelling RCC's as lacking natural monopoly characteristics was a statement of the obvious, not the promulgation of a rule. Therefore RAM was not improperly denied advance notice and the opportunity to be heard on this matter. *See* IC 8–1–2–88(b).

*Issue Six*

RAM also claims error was committed when the Commission admitted a market survey into evidence stating that the survey was irrelevant and that it was not given proper evidentiary foundation. We do not agree.

■ Surveys have frequently been employed by administrative bodies in making decisions. *Kinzel v. Rettinger* (1972), 151 Ind.App. 119, 277 N.E.2d 913 upheld a school board's decision which was based in part on a survey. Similarly, *Digital I* and *Digital II* also upheld Commission decisions which relied upon surveys of the paging market. Moreover, surveys were recently deemed as relevant to a jury's determination of "community standards" subject to meeting certain foundation requirements. *Saliba v. State* (1985), Ind.App., 475 N.E.2d 1181 found that public opinion polls were "uniquely suited" to a determination of community standards in an ob-

scenity case. Surveys to determine public convenience and necessity in a utility case are similarly appropriate and relevant.

■ *Saliba* established seven foundational criteria necessary prior to the admission of a poll or survey. RAM challenges the meeting of three of the requirements: (a) relevant universe surveyed, (b) representative sample surveyed, and (c) questions designed in accordance with generally accepted standards so as to obtain unbiased answers. *Id.* at 1187–88. Their fourth contention that the interviewers were not shown to be qualified is not germane: the proper conduct of the survey is not a foundation requirement but a factor in the weight accorded the poll. *Saliba, supra* at 1188.

■ Donald I. Hargadon, a consultant employed at Walker Research, provided the evidentiary foundation for the survey. He stated that 400 businesses were randomly selected from forty-four Yellow Page headings in the October 1982 Central Indiana Business to Business telephone directory. Telephone interviews with 200 of those businesses were completed. Hargadon also testified that all businesses were located with the affected eight county area.

Thus, the universe was proper as it was limited to businesses within the eight county area which were likely to subscribe to paging services. Hargadon also testified that the sample drawn was a simple random sample, indicative that a representative sample was obtained. As for the methodology, Hargadon stated that Walker Research, Inc. designed the questionnaire and that all questions had been pre-tested, having been used in prior studies.

MCI met the foundational requirements necessary to the survey's admission into evidence.

*Issue Seven*

RAM's seventh issue on appeal claims that the Commission granted MCI excessive relief as they produced only three witnesses who testified that they were in need of paging services. RAM contends that

the witness testimony reflects the needs of only an isolated few and that the opinion poll is hearsay which was improperly used as the sole basis for the PSC's finding.

▆▆▆ RAM correctly states the law. *V.I.P. Limousine Service, Inc. v. Herider-Sinders, Inc.* does indeed hold that the Commission may not find "public necessity upon the sole basis of the subjective preferences, desires or needs of an isolated few." *Supra*, 171 Ind.App. at 117, 355 N.E.2d at 446. Indeed the production of only three witnesses who represented only one county is hardly probative of need for paging services throughout the affected eight county area. Additionally, an administrative decision may not be based solely upon hearsay evidence. *CTS Corporation v. Schoulton* (1978), 270 Ind. 34, 383 N.E.2d 293.

RAM's argument is based upon a flawed premise, however, in that it characterizes the survey as mere hearsay. In the recently decided *Saliba v. State, supra*, Judge Shields wrote on this subject at length. She concluded, "In any event, it is now generally accepted neither the hearsay rule nor the requirement of firsthand knowledge bars the admission of properly conducted public opinion polls or surveys." 475 N.E.2d at 1187.

▆▆▆ Although perhaps the ideal in this case would have been for MCI to produce a plethora of witnesses from each of the eight counties, this is clearly impractical and unrealistic. *See Saliba, supra*, at 1185. Given the presence of a reliable survey, corroborated by RAM's own survey findings, and the production of some witnesses to testify to actual or anticipated need, we find that there is substantial evidence in light of the whole record to support the Commission's findings. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), 169 Ind.App. 652, 351 N.E.2d 814, *transfer denied* (1977).

*Issue Eight*

RAM's eighth challenge to the Commission's certification of MCI is that the Commission was biased. They argue that MCI Airsignal of Indiana was not required to show that it possessed the requisite managerial and financial ability and that MCI's evidence on this point was inadmissible hearsay.

The record shows that MCI Airsignal of Indiana is the "great grandchild" of MCI Communications Corporation.[5] MCI Indiana provided two sources of evidence that it has the requisite financial and managerial resources by virtue of its relationship with MCI Communications Corp.

First, Peter P. Conti, Vice President and Controller of MCI Airsignal of Indiana, Inc. and MCI Airsignal testified directly regarding MCI Indiana's financial backing. He said "MCI Airsignal, Inc. provides all management, financial and technical support necessary to develop and operate the mobile communications services that it and its subsidiaries offer to the public." (Record at 459). Conti also stated "MCI Airsignal's ability to make this financing available is based on a financial commitment from the ultimate parent corporation, MCI Communications Corporation." (Record at 467). Regarding the management of MCI Indiana, Conti testified that MCI Airsignal, a successful operator of RCC's in California, Colorado, Nevada and Pennsylvania, would develop and implement operating plans, provide staff, and oversee all aspects of operation. (Record at 458–59).

In addition to Conti's direct testimony, MCI Indiana offered a letter from the Treasurer of MCI Communications Corp., William E. Conway, Jr. to Gerald Taylor, the President of MCI Airsignal Indiana. The letter sets forth the financial commitment of MCI Communications to make all needed financial resources available to MCI Indiana through MCI Airsignal. It further stated "MCI [Communications Corp.] is

---

5. The appellee, MCI Airsignal of Indiana, is a wholly owned subsidiary of MCI Airsignal. MCI Airsignal's parent corporation is MCI Cellu-

lar Telephone Company which, in turn, is a wholly owned subsidiary of MCI Communications Corporation.

prepared to support this commitment with its extensive technical, financial and management resources to ensure MCI Airsignal of Indiana, Inc. is a viable competitor in the Indianapolis paging market." (Record at 527). Conti was the sponsoring witness for the letter.

▮ As noted earlier, an administrative decision may not be based solely on hearsay evidence. *CTS Corp., supra.* However, the evidence must be objected to at the hearing, or the objection is waived. *CTS, supra,* 383 N.E.2d at 297. We have searched the record in vain for RAM's objections to Conti's direct testimony that MCI Communications is committed to providing necessary backing to MCI Indiana through MCI Airsignal. *See* Record at 422–448. The argument that Conti's statements are hearsay is therefore waived. *CTS, supra.* Even assuming *arguendo* that RAM did make a timely objection, we are not of the opinion that Conti's testimony as presented was hearsay. Conti as Vice-President and Controller of MCI Indiana and of MCI Airsignal testified on the basis of personal knowledge of the financing and management proposed for MCI Indiana through MCI Communications. Thus, he was not merely offering an out-of-court statement made by a third party, a central component of hearsay. *See Plan-Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212, 1231.

▮ As for the letter, we do not believe that it was properly admitted under the business record exception to the hearsay rule. According to *McConnell v. State* (1982), Ind., 436 N.E.2d 1097, the sponsor of such an exhibit must show that the exhibit is part of the records made in the routine course of business, placed in the record by one who is authorized to do so, and who has personal knowledge of the transaction at the time of the entry. The business record exception typically has been employed to admit police records, hospital charts or routine bookkeeping entries such as billings or invoices. *See, e.g., McConnell, supra* at 1106; *Fendley v. Ford* (1984), Ind.App., 458 N.E.2d 1167,

1170, n. 3; *Burger Man, Inc. v. Jordan Paper Products, Inc.* (1976), 170 Ind.App. 295, 352 N.E.2d 821. Of course, even though the letter was hearsay, the Commission could admit it.

*Issue Nine*

▮ We also fail to see merit in RAM's last argument which contends that the Commission abused its discretion by failing to require MCI Indiana to file the same tariff as that they proposed. The Public Service Commission Act does not require that initial rates be approved; it only requires that rate changes be approved. IC 8–1–2–42. Moreover, there is no indication that MCI intends to charge a rate other than that which it proposed.

The decision of the Commission is therefore affirmed.

NEAL, J., (sitting by designation) concurs.

HOFFMAN, J., dissents and files separate opinion.

HOFFMAN, Judge, dissenting.

I respectfully dissent. The majority herein conclude that a finding that other radio common carriers were not willing and able to adequately serve customers was not required to be made by the Public Service Commission. They concede that inadequacy of present services had consistently been used as a factor by the Commission in its past decisions to issue additional certificates but hold that such a finding is no longer necessary. I believe such a finding is necessary.

Indiana Code § 8–1–2–88 provides that no telephone company shall render telephone service in an area where another company has been awarded a certificate of territorial authority,

> "except pursuant to a certificate granted by the commission, after notice of hearing and hearing, that public convenience and necessity require that telephone service in any such area be rendered or offered by another company."

All public utilities are required by Indiana Code § 8–1–2–4 to furnish "reasonably adequate services and facilities." Whether or not an existing telephone company is providing reasonably adequate service is a factor which should be considered before a determination may be made that "public convenience and necessity" demands additional services.

The Commission failed to make a finding that services were not being adequately provided before awarding the additional certificate herein. The Commission is required to make specific findings of ultimate fact upon which its decision is based. IND. CODE § 8–1–1–5; *Stewart Trucking, Inc. v. Bunn Trucking, Inc.* (1972), 151 Ind. App. 157, 278 N.E.2d 310. The failure of the Commission to find specific facts upon which its order is based renders the order illegal and unlawful. *Stewart Trucking, Inc. v. Bunn Trucking, Inc., supra.* The majority, relying upon *Indiana Bell Tel. Co. v. T.A.S.I., Inc.* (1982), Ind.App., 433 N.E.2d 1195, believe that such a finding may be established by implication upon consideration of the evidence. However, lack of an express finding may not be supplied by implication. *Indpls. & So. Motor Exp., Inc. v. Pub. Serv. Comm.* (1953), 232 Ind. 377, 112 N.E.2d 864.

This State has the right to control and regulate the provision of services by public utilities and does so through the Public Service Commission. *Daviess-Martin Co. etc. v. Pub. Serv. Comm.* (1961), 132 Ind. App. 610, 174 N.E.2d 63. The Commission's power to regulate public utilities exists for the benefit and protection of both the public and the utility, to promote the efficient provision of services. *State, ex rel. v. Lewis* (1918), 187 Ind. 564, 120 N.E. 129. By the very nature of things, there must be some limit to the number of telephone companies that can serve the public. *State, ex rel. v. Stickelman* (1914), 182 Ind. 102, 105 N.E. 777.

The Commission is an administrative board, created by the legislature and derives its power from statute. *Gen. Tel. Co., etc. v. Pub. Serv. Comm. of Ind. et al.*

(1958), 238 Ind. 646, 150 N.E.2d 891. The statute herein requires a finding of public convenience *and necessity* before the Commission may issue an additional certificate of territorial authority. Without a finding of an inadequacy of service, necessity cannot be established. The Commission herein is not "regulating" as it is empowered to do, but instead is deregulating, contrary to its enabling statute.

The decision of the trial court should be reversed.