George SALIBA, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 2–383A74.

Court of Appeals of Indiana,
Second District.

March 28, 1985.

Richard Kammen, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., William E. Daily, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Defendant George Saliba (Saliba) appeals his conviction for distribution of obscene matter, a class A misdemeanor under I.C. 35–30–10.1–2–(2) (Burns Code Ed., 1979) recodified at I.C. 35–49–3–1 (Burns Code Ed., Supp.1984).[1] The only issue we address is

---

1. I.C. 35–30–10.1–2 provides: "A person who knowingly or intentionally ... (2) offers to dis-tribute, distributes, or exhibits to another per-

whether the trial court erred in excluding the results of a public opinion poll[2] on the issue of community standards.

Reversed.

## FACTS

Saliba was charged with exhibiting an obscene film in his adult book store in Indianapolis on November 12, 1981. The film which formed the basis for Saliba's conviction depicted three males involved in various homosexual activities. Prior to trial, Saliba employed Dr. Roderick Bell of California to conduct a public opinion poll to determine community standards in Marion County regarding the depiction of sexual activities in movies and publications. At trial and out of the jury's presence, Saliba offered into evidence the results of the poll designed by Dr. Bell. In support of the offer, Dr. Bell testified to his qualifications[3] and explained the general nature of public opinion polls. Dr. Bell then extensively discussed the scientific methodology generally employed in conducting polls and detailed the specific techniques employed in conducting the poll at issue. Based on the design, execution, tabulation and verification of the instant poll, Dr. Bell opined that the poll was a valid measure of the degree of public acceptance of sexually explicit materials in Marion County.

The State objected to the poll's validity and presented the expert testimony of Dr. Brian Vargus. Following Dr. Vargus' examination of the poll during a lunch break on the day of trial, he opined the manner in which the poll was conducted potentially generated 30% "pseudo-opinion". However, Dr. Vargus also testified his opinion depended on whether Dr. Bell had conduct-

ed a proper "pretest" and other methodological checks.

After the State renewed its objection to the admission of the poll, the trial judge ruled the poll inadmissible. Saliba then recalled Dr. Bell who testified a pretest was indeed conducted and characterized Dr. Vargus' testimony as merely presenting a methodological dispute between experts. In fact, Dr. Bell testified if the methodology suggested by Dr. Vargus had been used, the results of the poll would have been biased in Saliba's favor. The poll was again offered into evidence but again excluded by the trial court.

## DISCUSSION

The State had the burden of proving the film confiscated from Saliba's store was "obscene" as defined by statute. I.C. 35–30–10.1–1 (Burns Code Ed., 1979) recodified at I.C. 35–49–2–1 (Burns Code Ed., Supp.1984) provides, in pertinent part,

"A matter or performance is obscene for purposes of this article if: (1) the average person, applying contemporary community standards, finds that the dominant theme of the matter or performance, taken as a whole, appeals to the prurient interest in sex;"[4]

The determination of obscenity, therefore, depends upon prevailing community standards.

### Survey Evidence in Obscenity Prosecutions

As the State contends, the obscene character of materials may be determined by the jury based on a viewing of the allegedly offensive material. The State need not present an expert witness or other

---

son obscene matter; commits a class A misdemeanor."

2. Questions 6 and 12 of the poll were excluded from evidence after a pre-trial hearing on the State's motion to suppress the results of the poll. In his brief Saliba does not challenge the court's exclusion of the responses to these questions; we express no opinion regarding their admissibility. The exclusion of the responses to the remaining questions is the subject of the instant opinion.

3. No objection was made to Dr. Bell's qualifications as an expert.

4. I.C. 35–30–10.1–1 continues: "(2) the matter or performance depicts or describes, in a patently offensive way, sexual conduct; and (3) the matter or performance, taken as a whole, lacks serious literary, artistic, political, or scientific value."

evidence of community standards. *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Sedelbauer v. State,* 455 N.E.2d 1159 (Ind.App.1983).

■ However, expert evidence on this issue may be highly relevant. The jurors are not instructed to evaluate obscenity based on their personal opinions but are charged with applying contemporary community standards. *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). In the absence of expert testimony, the jury's determination of contemporary community standards runs the risk of incorporating the individual juror's "necessarily limited, hit-or-miss subjective view" "on the basis of his personal upbringing or restricted reflection or particular experience of life." *Smith v. California,* 361 U.S. 147, 165, 80 S.Ct. 215, 225, 4 L.Ed.2d 205 (1959) (Frankfurter, J., concurring). Consequently, the defendant in an obscenity prosecution is entitled to introduce relevant and appropriate expert testimony on the issue of contemporary community standards. *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492.

Expert testimony based on a public opinion poll is uniquely suited to a determination of community standards. Perhaps no other form of evidence is more helpful or concise: "A properly conducted public opinion survey itself adequately ensures a good measure of trustworthiness, and its admission may be necessary in the sense that no other evidence would be as good as the survey evidence or perhaps even obtainable as a practical matter." *Commonwealth v. Trainor,* 374 Mass. 796, 374 N.E.2d 1216, 1221 (1978).

The alternative modes of introducing such evidence are less desirable *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670 (S.D.N.Y.1963) (leading case on survey evidence). For example, the presentation of in-court testimony from the entire target population or even a representative sample is patently impractical. And the use of an expert witness to testify regarding his or her opinion on community standards is not as direct or accurate as a public poll, even assuming an expert could qualify on the subject. *E.g. Sedelbauer v. State,* 455 N.E.2d at 1165 (held sex therapist unqualified to testify on county standards). The nature of public opinion polls renders them better suited to demonstrate contemporary community standards.

### Admissibility of Survey Evidence

In the instant case, the State objected to the admission of the public opinion poll both on the grounds of relevancy and trustworthiness. Specifically, the State argued the poll's focus on overall community standards did not determine whether the film in question was obscene. Alternatively, the State argued the poll was improperly conducted and therefore unreliable. We will address each contention in turn.

### A. Relevancy

At trial, the State argued the degree of community acceptance of "sexually explicit materials" was not relevant to a determination of whether the particular film in question was obscene. However, on appeal, the State argues irrelevancy based upon another theory. On appeal, the State cites two cases from sister states which found allegedly similar surveys irrelevant because those surveys only examined whether the community sanctioned the dissemination of sexually explicit materials to willing adults (*i.e.,* community standards); the surveys did not examine whether the community regarded similar materials or the particular materials in issue as obscene. *See Flynt v. State,* 153 Ga.App. 232, 264 S.E.2d 669, *cert. denied* 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114 (1980); *Commonwealth v. Mascolo,* 7 Mass.App. 275, 386 N.E.2d 1311 (1979). We address both of the State's arguments of irrelevancy, that at trial and that on appeal, because of our obligation to affirm the trial court's action in excluding the poll if its exclusion was proper on any basis. *Fendley v. Ford,* 458 N.E.2d 1167 (Ind.App.1984).

Our probe into relevance is therefore two-pronged. Were the questions in the poll relevant to a determination of 1) com-

munity standards in general and 2) the community's acceptance of viewing the particular film in question.[5]

### 1. General Community Standards

We first determine whether the questions in the poll were relevant to a determination of community standards. For example, question seven asked: "Do you personally think it is acceptable or not acceptable for the average adult to see any depiction of actual or pretended sexual activities shown in movies and publications that he or she wants to?" The balance of the questions in the poll merely changed the type and location of access to such materials to movies, books, or magazines and theaters, bookstores, or arcades. The poll therefore questioned the interviewees regarding their view of community acceptance of sexually explicit materials rather than their personal acceptance of such materials.

 We must emphasize the majority of the community need not desire to view sexually explicit materials in order to establish community acceptance or tolerance of such materials. Rather, the issue concerns the population's perception of what is generally acceptable in the community considering the intended and probable recipients of the materials. *Pinkus v. United States*, 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978). The questions in the poll parallel the statutorily mandated standard; matter is "obscene" if "the average person, applying contemporary community standards" finds the material as a whole appeals to the prurient interest in sex. I.C. 35–30–10.1–1 (Burns Code Ed.1979) recodified at I.C. 35–49–2–1 (Burns Code Ed., Supp.1984). The poll's results were relevant evidence of the community standards which the jury was obligated to apply.

### 2. Acceptance of Particular Film

We must also determine if the community acceptance of viewing "nudity and actual or pretended sexual activity", as phrased throughout the poll, is relevant to a determination of the acceptance of viewing the film in question. We also answer this inquiry in the affirmative. The poll defines "nudity and pretended or actual sexual activity" as "total male and/or female nudity, and sexual intercourse including all kinds of sexual variation."[6] Appendix A. The

---

**5.** At trial, the court found the survey was relevant assuming it was properly conducted:

"Since this is a crime where the community determines whether or not it is a crime, a poll is, indeed, a fact that the jury should consider. A poll that gives an indication how this community feels. The only problem this Court has with this poll is with question number 13. If question number 13 were asked at the beginning of the interview rather than at the end, the Court would have absolutely no problem allowing this poll to be admitted into evidence. But, that does make a difference in my mind that the question defining the terms was asked at the end rather than at the beginning. And for that reason the Court is going ... does not find that this poll should be admitted into evidence."

Record at 513–14. After Dr. Bell testified the poll was extensively pretested, Saliba again offered the poll into evidence. The trial court again excluded the poll, stating:

"Again, as the Court has ruled, the Court does believe that this type of poll, if conducted properly, would definitely be relevant. The Court believes that because of question number 13, defines the terms at the end rather than at the beginning of the poll, and the

other evidence that's been introduced through the expert presented by the Prosecutor, the Court does deny defendant's motion."

Record at 523–24.

In the order denying Saliba's Motion to Correct Errors, the trial court stated:

"The Court found that a poll could be relevant if it was properly conducted. (2) the questions were not relevant to the issues before the Court as they ... did not advise the respondent of what level of sexual explicitness was involved until the end of the poll, and even at that time the question was not clear."

Record at 227.

**6.** We note the trial court found the placement of this definition at the end of the poll created an ambiguity in this definition. Given the validity of the poll, discussed *infra*, we may accept Dr. Bell's explanation a pretest indicated respondents understood the questions as intended. We also note 91% of the respondents understood the terms as defined. Appendix A. In any event, generally, any objection regarding ambiguity of the questions affect the poll's weight, not its admissibility. *Carlock v. State*, 609 S.W.2d 787 (Tex.Crim.App.1980).

sexual activity portrayed in the instant film fell within the definition of "nudity and actual or pretended sexual activity."

■ Although the poll did not present the interviewees with the ultimate question to be decided by the jury (*i.e.,* whether the particular film was obscene), the poll was relevant to an application of community standards. The court in *Carlock v. State,* 609 S.W.2d 787 (Tex.Crim.App.1980), cogently addressed this issue in response to an identical objection to another poll conducted by Dr. Bell:

"[I]t is arguable that the survey would have been more probative if it had asked whether the particular magazine in question appealed to the prurient interest of the average person. Even so, this would not authorize the trial court to exclude from evidence the public opinion survey offered in this case. The expert evidence would not be rendered inadmissible simply because more probative questions could have been incorporated into the poll."

*Id.* at 789–90. The failure to poll the population on the ultimate issue does not negate relevancy. The population's general opinion is probative, although not determinative, of community standards and, consequently, of the population's specific opinion of the film in question.

## B. Trustworthiness

Although the poll was relevant, we must also determine whether it was admissible. Relevant public opinion polls and other survey evidence are widely accepted as generally admissible if properly conducted. *See generally Zippo,* 216 F.Supp. at 682. Objections to admissibility usually arise because the contents of public opinion polls are generally not within the firsthand knowledge of the submitting witness; they may also constitute hearsay.

Several theories, however, have been advanced to justify the admission of public opinion polls. Some authorities classify

polls as falling under the state of mind exception to the hearsay rule. Others characterize polls as hearsay but conclude the need for the evidence at trial and the circumstantial guarantees of trustworthiness justify admission. Still other authorities classify survey evidence as non-hearsay, and therefore directly rely on the rules governing admission of expert testimony generally. *Id.* In any event, it is now generally accepted neither the hearsay rule nor the requirement of firsthand knowledge bars the admission of properly conducted public opinion polls or surveys. As explained in the Advisory Committee's Note to Fed.R.Evid. 703: "Attention is directed to the validity of the techniques employed rather than the relatively fruitless inquiries whether hearsay is involved." 51 F.R.D. 404 (1971).

■ The admissibility of a public opinion poll depends primarily upon the presence of circumstantial guarantees of trustworthiness. 1 J. Moore, *Moore's Federal Practice* 2.712 (1982). Public opinion polls are surveys [7] designed to elicit the state of mind of a targeted population ("universe") through an examination of a representative portion ("sample") of the universe. Through accepted statistical analysis, the sample data is used to project the opinion of the entire targeted population. In short, the circumstantial guarantees of trustworthiness are premised on 1) the use of generally accepted surveying techniques in conducting the poll and 2) adherence to statistically correct methods in conducting the poll and evaluating the results.

■ This twofold inquiry has led to the judicial development of six foundational criteria which are generally accepted as scientifically necessary to insure a poll's reliability and, consequently, its admissibility. The proponent of a poll has the burden of establishing: 1) the poll was conducted by an expert in the field of surveying; 2) the relevant universe was examined; 3) a

---

7. The term "surveys" usually refers to both "samples" and "polls". "Samples" are generally concerned with collecting objectively observable

facts whereas polls are designed to elicit subjective views. *See, e.g.,* J. Moore, *Moore's Federal Practice* § 2.712 at 133–34 (1982).

representative sample was drawn from the relevant universe; 4) the mode of questioning was "correct" (mail, telephone, personal interview, etc.); 5) the sample, questionnaire, and the interviews were designed in accordance with generally accepted standards; 6) the data gathered was accurately reported; and 7) the data was analyzed in a statistically correct manner. J. Moore, *supra* at 138; *accord Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir.1980).[8] The adherence to this generally accepted methodology renders the poll's results admissible in the form of expert opinion.

■■■ Once these foundational requirements are established, subject to cross-examination, the poll is admissible. *Baumholser*, 630 F.2d at 553; *Zippo*, 216 F.Supp. at 686. Any objection, other than to the lack of foundational requisites, and any testimony challenging the foundational testimony affect the weight accorded the poll, not its admissibility: "Once the offered poll has passed the test of admissibility, the objections to the manner in which it was conducted go to the weight of the polls as evidence." J. Moore, *supra* at 139. Given an adequate foundation, questions regarding the technical adequacy of a poll affect the poll's weight only. *People v. Thomas*, 37 Ill.App.3d 320, 346 N.E.2d 190 (1976).

■■■ Accordingly, in ruling on the admissibility of a poll, a distinction must be made between an objection based upon an omission of a foundational requisite and any other objection including an objection which disputes the validity (as opposed to an omission) of a foundation requisite.[9] The lack of a complete foundation affects admissibility whereas any other objection affects only the weight to be given an otherwise admissible poll. *E.g., People v. Thomas*, 37 Ill.App.3d 320, 346 N.E.2d 190,

194. For example, in *Thomas*, the use of mimeographed cards completed by a majority of patrons of a movie theatre exhibiting "Deep Throat" did not comport with accepted sampling techniques and therefore the foundation was incomplete. *Accord Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir.1978). Similarly, in *Commonwealth v. Trainor*, 374 Mass. 796, 374 N.E.2d 1216 (1978), a survey on community standards was excluded where there was no indication the method of selection of the interviewees assured a representative sample. The lack of an adequate foundation again provided grounds for exclusion.

■■ These cases are in contrast to the instant case where Dr. Bell's foundation testimony explained the typical methodology used in conducting opinion polls and described the methodology employed in conducting the instant poll. Dr. Bell identified the "universe" as the adult population of Marion County. This "universe" was sampled by telephone using a random digit dialing technique, the currently preferred method of telephone interviewing. This technique used a list of telephone numbers randomly generated by computer in proportion to the number of lines for existing telephone prefixes. During the first two weeks of February, 1982, five hundred (500) adults from Marion County were questioned by interviewers from Herron Associates of Indianapolis, a field service.[10] The interviewers were instructed and supervised by Dr. Bell. Dr. Bell prepared the questionnaire through the use of extensive "pretesting" techniques designed to insure the questions were understood by the interviewees. The interviewers were instructed to read the questionnaire to the interviewees and record the responses as designated by the accompanying "code sheet" or an-

---

8. Other authorities indicate the necessity for the poll or survey to be conducted independently of the attorneys involved and without knowledge of the litigation by the interviewers or interviewees. *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978); Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429 (1960).

9. "Technical inadequacy" refers to any alleged insufficiency other than a deficiency in the foundation.

10. The use of interviewers from a field service is "almost univrsal". Record at 411.

swer key. Once the interviews were complete, a subset of the sample was recontacted by the field supervisor to verify the interview took place and the responses were accurately coded. Dr. Bell then drew a subset of the sample to reverify. Dr. Bell testified this form of spot checking is the only accepted verification technique. The raw data was keyed into a computer for tabulation; Dr. Bell also supervised this data input. The results of the poll were 98% repeatable within a margin of error of 3% to 4%. Dr. Bell testified that the definitions, standards and methodologies described were used by "practically all" national polling organizations including Lou Harris. Dr. Bell's testimony alone provided a complete foundation for admission of the poll.

We recognize Dr. Vargus, who was not present for Dr. Bell's testimony, disputed the appropriateness of several methods he assumed were employed in Dr. Bell's poll. Dr. Vargus objected to the clarity of the questions used in the questionnaire, but recognized the validity of the "pretest" technique to detect ambiguities. He also asserted the necessity for built-in cross checks to detect inconsistencies in the responses and alleged the sample was skewed because 60% of the interviewees were women. Dr. Vargus acknowledged the wide acceptance of the telephoning technique but contended personal interviews would have been preferred given the complexity of the poll.

In sum, Dr. Vargus' testimony and the State's objections dispute only Dr. Bell's expert opinion that the poll's results[11] were a reliable index of community standards, i.e., they dispute the methodology used for the poll. Thus, we are only here concerned with the propriety of excluding the poll based on Dr. Vargus' expert opin-

ion that the poll was methodologically unsound.

▆▆▆▆ Although no Indiana appellate decision has previously addressed the admissibility of a public opinion poll,[12] the Indiana Supreme Court has repeatedly favored admission of expert opinion challenged merely for technical inadequacies. The most recent comprehensive decision appears in *Martin v. Roberts*, 464 N.E.2d 896 (Ind.1984), in which a state trooper's opinion of vehicular speed was held admissible although not based on any formula, calculation or principle. Once the state trooper qualified as an expert witness on the general subject, his failure to use any articulable calculations considering the effect of several possibly relevant factors affected only the weight of his opinion, not its admissibility. Our supreme court explained:

> "There are doubtless many formulas and principles which experts use in this field or any other to arrive at their ultimate opinions. The determination of which factors, formulas or calculations are necessary, ... to form an expert opinion is *within the knowledge and judgment of the expert* and, again, is a subject which can be approached and examined in the cross-examination or by bringing forward other expert witnesses."

*Id.* at 900 (emphasis added). It is not the trial court's function to dispute the validity of an opinion rendered by a competent and qualified expert. Once the basis for an expert's opinion is established, in the instant case the foundational testimony for admission of the poll, the effect of objections or competing expert testimony is restricted to the weight attributed to the opinion by the fact-finder.

---

11. A poll's numerical results (the raw data) are more akin to fact than opinion. We make this distinction to emphasize the expert opinion testimony with which we are concerned is limited to expert opinion testimony concerning the methodology of the poll itself. Because the results here were excluded we are not concerned with expert opinion testimony regarding the interpretation of the raw data which may be characterized as the poll's results.

12. Only *Sedelbauer v. State*, 455 N.E.2d 1159 (Ind.App.1983) and *Richards v. State*, 461 N.E.2d 744 (Ind.App.1984) address the need for an expert's opinion on community standards. Neither case, however, addresses the admissibility of a public opinion poll. Although not of concern here, these cases also do not address the admissibility of expert opinion of community standards based upon the results of a public opinion poll.

■ We emphasize the basis for an expert's opinion should exhibit professional acceptance and reliability. We would be hard-pressed to admit the opinion of an otherwise qualified expert who nevertheless relied on a Ouija board to compute the speed of a vehicle. There is an assumption that an expert's opinion is based on his or her particular expertise. Fed.R.Evid. 703, which was, in part, designed to facilitate admission of survey evidence, suggests the facts which form the basis for an expert opinion should be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences *upon the subject*" (emphasis added). If the data relied upon does not meet this criterion, the data must be independently admissible. Fed.R.Evid. 703. An otherwise properly conducted opinion poll, for example, must employ generally accepted techniques *for discerning the data sought.* The extent to which an expert's opinion is based upon his opinion *as an expert* must be distinguished from the extent to which an expert's opinion is based upon his opinion *as an individual;* the former merely affects the weight of an opinion while the latter may affect its admissibility.

■ In the instant case, we conclude the trial court erred by weighing and choosing between the opinions proffered by two qualified experts as to the validity of the polling techniques. Both Dr. Bell and Dr. Vargus were qualified as experts in surveying public opinion and the foundation testimony detailing the methodology employed by Dr. Bell comported with generally accepted survey techniques for discerning the data sought. The dispute centered only on whether Dr. Bell chose the most appropriate techniques, in Dr. Vargus' opinion, to conduct this particular survey. Although Dr. Vargus may have chosen to employ additional or different standard techniques, the poll was nevertheless conducted in accordance with accepted survey methodology. A professional dispute between qualified experts does not provide a basis for exclusion of the poll. The State's objections and Dr. Vargus' testimony merely affected the poll's weight, not its admissibility. The survey was erroneously excluded.[13]

Judgment reversed and cause remanded for a new trial.[14]

13. A similar poll, also conducted by Dr. Bell, was found erroneously excluded in *Carlock v. State,* 609 S.W.2d 787 (Tex.Crim.App.1980). Similar to the State in the instant case, the State in *Carlock* alleged the survey questions were possibly misleading or confusing. The Texas court summarily held "[s]uch an argument should be addressed to the jury in its capacity as the exclusive judge of the weight to be given the evidence." *Id.* at 790 (timing of survey also a question as going to weight, not admissibility).

14. Saliba assigns as error the trial court's exclusion of eight magazines offered as comparison materials to demonstrate prevailing community standards. The magazines offered and excluded were Playboy, Penthouse, Hustler, Eros, Velvet, Chic, Oui, and Playgirl. Since this issue may arise again on retrial, but undoubtedly in another posture, we only offer the following guidelines and do not decide the issue.

The admission of numerous allegedly comparable materials may render a trial unmanageable and lengthy. Consequently, the admission of comparison materials is within the broad discretion of the trial court and must meet established criteria. *United States v. Womack,* 509 F.2d 368, 378 (D.C.Cir.1974), *cert. denied,* 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681 (1975).

The foundation for admission of comparison evidence on the issue of community standards is a showing the proffered evidence 1) is similar to the material in issue and 2) enjoys a reasonable degree of community acceptance. *Id.* at 376.

In the instant case the trial court found the proffered evidence enjoyed a reasonable degree of community acceptance but excluded the proffered magazines because the trial court found the magazines were dissimilar to the film in issue.

At trial, a magazine distributor testified as to the number of copies of the proffered magazines that were sold to various outlets in central Indiana (distribution data). However, he further testified the proffered magazines did not depict sexually explicit acts between males.

Based upon this record we make two observations. First, a showing of sexual explicitness may be sufficient to satisfy the first element of the *Womack* test. But the function served by comparison of evidence presupposes the materials presented depict the same or similar sexual acts with explicitness of a comparable degree. *U.S. v. Pinkus,* 579 F.2d 1174 (9th Cir.1978). Saliba offered, in part, written matter for comparison to a film.

He argued each magazine contained sexually explicit material, either written or pictorial, in-

BUCHANAN, C.J., concurs.

SULLIVAN, J., concurs, with separate opinion.

### Appendix A

After obtaining background on each respondent, the interviewer asked the following questions:

Thank you. Now I have just a few questions on the subject of community standards in Indiana. I only need your personal opinions, which will be held in confidence.

*6. In your opinion, have standards in Indiana changed in recent years so that depictions of nudity and sexual activities in movies and publications available only to adults are now more acceptable or less acceptable, or haven't they changed much?

7. Do you personally think it is acceptable or not acceptable for the average adult to see any depiction of actual or pretended sexual activities shown in movies and publications that he or she wants to?

In your opinion, is it now all right or not all right in the state of Indiana for

8. adults who want to view them, to purchase magazines that show nudity and actual or pretended sexual activities?

9. movie theaters, restricting attendance to adults only, to show films that depict nudity and actual or pretended sexual activities for adults who want to attend?

10. bookstores that restrict admittance to adults to sell publications and movies depicting nudity and actual or pretended sexual activities for adults who want to go inside and buy them?

11. arcades that restrict admittance to adults only to show films that depict nudity and actual or pretended sexual activities?

*12. adults who want to, in the privacy of their homes, to see movies and publications that depict nudity and actual or pretended sexual activities?

13. Finally, we have used the phrases "nudity" and "sexual activities" in the interview. What we mean by these terms is total male and/or female nudity, and sexual intercourse including all kinds of sexual variation. Is that what you understood we meant, or did you think we meant something else?

SULLIVAN, Judge, concurring.

I agree that the trial court erroneously excluded this public opinion poll. As a

---

cluding homosexual as well as heterosexual conduct. On appeal, Saliba repeats general allegations regarding the contents of the magazines, which span over 1,000 pages. However, the only specific comparisons made by Saliba are two references to columns in Playboy and Penthouse magazines. One of the columns contains letters from readers discussing current social issues such as abortions and nuclear weapons. The other column contains detailed written descriptions of heterosexual, group and lesbian sex; the article does not describe any male homosexual conduct.

We are persuaded a valid basis may exist for excluding written depictions of sexual activity for comparison to sexually explicit films. Even a detailed written depiction leaves much to the reader's imagination; a film does not. Films are commonly, perhaps inherently, more explicit. For example, magazine photographs rarely, if ever, suggest ongoing sexual activity, either heterosexual or homosexual. Thus, the use of different media to depict even sexually explicit

matter militates against admission of alleged comparable evidence since even "slight variations in format may well produce vastly different consequences in obscenity determinations." *Womack,* 509 F.2d at 378; *accord U.S. v. Pinkus,* 579 F.2d 1174 (9th Cir.1978) (films not comparable to brochures and magazines).

Second, we observe data evidencing the extent of a magazine's distribution in a community may satisfy the second element of the test when it establishes a reasonable degree of community acceptance as opposed to mere availability. However, distribution data must be viewed with caution: "a determination of the precise point at which a publication is so widely sold and is so generally available in the community as to warrant a finding of community acceptance is difficult to fix with assurance." *United States v. Womack,* 509 F.2d 368, 379 (D.C.Cir.1974).

* The exclusion of questions 6 and 12 is not in issue. See *supra* note 2.

**1192**

matter of law, the positioning of Question # 13 did not adversely affect the accuracy of this poll. Therefore, the particular dispute between the experts here as to the accuracy of the poll could not legitimately serve as a basis for excluding the poll.[1]

However, I must disagree with the majority's distinction between admissibility of evidence of this nature and the weight to be attributed to such evidence.

As the majority herein acknowledges, a poll is admissible if circumstantial guarantees of trustworthiness are present. The majority further acknowledges that the foundational requirements for the admissibility of a poll must be established and may not be assumed. My agreement with this premise prompts my separate opinion.

Establishment of the foundational requirements is essential to the determination of admissibility. Failure to establish those requirements must result in exclusion of the evidence. This threshold determination must be made by the trial court. The determination as to the presence of those guarantees of trustworthiness necessarily falls to the trial court in its ruling as to admissibility. The guarantees therefore affect admissibility in the first instance, even though those same factors thereafter might be considered by a jury in assessing the weight to be given the poll. Nevertheless, the trial court must resolve the question in the first instance and may not avoid the issue upon the premise that those factors go only to the weight of the evidence.

Admissibility is within the sole prerogative of the trial judge. The fact that the disagreement which must be resolved may be within the peculiar realm of the experts does not alter the nature of the determination from one of admissibility to one of the weight to be given the poll. The trial judge under such circumstances cannot avoid the duty to make a determination as to admissibility even though that determination requires him to weigh the conflicting testimony of two experts.

It may be that matters of this sort are similar to the process followed to determine admissibility of a confession in a criminal case. *See Long v. State* (1981) Ind., 422 N.E.2d 284 in conjunction with *Tanner v. State* (1984) Ind., 471 N.E.2d 665.

In any event, I disagree with the implication that once a proponent of evidence has qualified as an expert and has stated that his poll is accurate, such poll must be admitted into evidence.[2]

The majority would seem to require that the poll be admitted no matter how inadequate the validating procedures, so long as the expert states, that in *his* opinion, the procedures were adequate to establish trustworthiness.

In these aspects of the majority opinion, I find fault, although I agree with the conclusion that this poll was admissible.[3]

---

1. In the case before us, the experts disagree with respect to whether one of the foundational requirements has been met. In essence, the disagreement between Drs. Bell and Vargas is whether the circumstantial evidence of trustworthiness has been sufficiently established to permit the poll to be admitted and to be weighed by the jury. Reduced to its barest essentials the experts are in disagreement with respect to whether the poll is admissible or not.

2. The majority would seem to permit the expert to validate his own methodology by merely opining that he has complied with the seven requirements enumerated at pages 1187–88 of the opinion.

3. In holding this public opinion poll admissible, I do not believe the majority may properly avoid outright rejection of *Richards v. State* (1984) 3d Dist., Ind.App., 461 N.E.2d 744, and *Sedelbauer v. State* (1983) 3d Dist., Ind.App., 455 N.E.2d 1159. *See* Majority Opinion, p. 1189, n. 12. In holding that no expert testimony is permitted with respect to establishment of a community standard, those cases necessarily preclude the expert testimony necessary to provide a foundation for an opinion poll which might establish the community standard. The import of *Richards* and *Sedelbauer* is that the applicable community standard may be established solely by each jury upon a case-by-case basis.